**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AVRAHAM SISSO,<br><br>                              Plaintiffs,<br><br>          v.<br><br>ISLAMIC REPUBLIC OF IRAN, et al.,<br><br>                              Defendants. | Civil Action No.  1:05-cv-394 (JDB) |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**INTRODUCTION**

On September 19, 2002, at approximately 1:00 p.m., a suicide bomber stepped aboard the number 4 passenger bus in central Tel Aviv, Israel and detonated a bomb that killed six people and injured 84 others.  Plaintiff Avraham Sisso, the son of the decedent Rozana Sisso, who was killed in the bombing, has brought this civil action against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and Harakat al-Muqawama al-Islamiyya (known as the "Islamic Resistance Movement" or "Hamas") seeking damages for the severe emotional distress he suffered and continues to suffer as a result of his mother's murder, pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA") (28 U.S.C. §§ 1602-11) and claims under New Jersey tort law and the Antiterrorism Act of  1991 ("ATA") (18 U.S.C. § 2333(a)).

On August 23, 2006, this Court ordered entry of default against the defendants, who thus far have failed to enter any appearance in this action.  See Sisso v. Islamic Republic of Iran, 448 F. Supp. 2d 76, 92 (D.D.C. 2006) (hereinafter "Sisso").  Pursuant to the Court's

November 11, 2006 Order granting plaintiff's motion to present expert evidence by affidavit and prior testimony, plaintiff submitted affidavit testimony and prior testimony on December 1, 2006.  The Court held a bench trial on December 7, 2006, and received plaintiff's Proposed Findings of Fact and Conclusions of Law on January 31, 2007.  Based on a careful review of the evidence presented, the Court makes the following findings of fact and conclusions of law.   The Court concludes that plaintiff has "establish[ed] his claim or right to relief by evidence satisfactory to the court," as required by section 1608(e) of the FSIA with respect to plaintiff's claims against Iran and MOIS, and that he also is entitled to relief with respect to his claim against Hamas.   Accordingly, the Court enters judgment in favor of plaintiff Sisso against defendants Iran, MOIS and Hamas, as set forth in the judgment issued by the Court simultaneous with this Order.

## PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based upon the affidavit testimony of plaintiff's expert witnesses, Dr. Patrick Clawson, Mr. Christopher Hamilton, and Dr. Larry Pastor, M.D., the testimony of plaintiff Avraham Sisso and Mr. Sisso's brother, Moshe Siso,[1] and the various exhibits and other affidavits entered into evidence.

## I.    Background

1.   Decedent Rozana Sisso, a sixty-three year old woman, was an Israeli citizen living in Gan Yavne, Israel at the time of her death. Tr. 15, 39.  Before she died, Rozana Sisso owned and operated a women's clothing shop, known as Rozana's (or Shoshana's, in Hebrew) Shop, which was located at 101 Allenby Street, a major thoroughfare in central Tel Aviv.  The store was located across from the Great Synagogue, the biggest synagogue in Tel Aviv, and close

---

[1] Unlike Avraham Sisso, Moshe Siso chooses to spell his name without the third "s" when translating it from Hebrew.

to the bus stop for passenger bus Number 4.  Tr. 16-17, 20-21, 44; Ex. 1 (map of central Tel Aviv); Ex. 2 (video of Rozana Sisso's and Moshe Siso's stores).

2.   Plaintiff Avraham Sisso was born on September 23, 1963 in Beer Sheva, Israel.  Tr. 34-35; Ex. 11 (U.S. Naturalization certificate).[2]  Rozana Sisso was Mr. Sisso's mother.  Mr. Sisso moved to the United States in 1989 and became a naturalized U.S. citizen on April 11, 1996.  Tr. 34-35; Ex. 11.  Mr. Sisso now resides in Rochester Hills, Michigan with his wife Cindy and his two daughters, Dana and Rachel, who are 13 and 10 years old, respectively. Tr. 33-34.  Mr. Sisso was domiciled in New Jersey at the time of his mother's death.  Tr. 50.

3.   Rozana Sisso is also survived by her husband, Charles (Sharl or Shalom in Hebrew) Sisso, and her three other children, Moshe Siso, Tobi Barda and Galit Sider, Tr. 15, 36-37, all of whom are Israeli citizens and reside in Israel.

4.   Mr. Moshe Siso, Rozana Sisso's oldest son, owned and operated a jewelry shop located immediately next door to his mother's shop at the time of his mother's death.  Tr. 13-14, 16-17, 19-21, 27, 43-44; Ex. 2 (Video of Rozana Sisso's and Moshe Siso's Stores).  The neighborhood around Mr. Siso's and his mother's stores was a lively, heavily populated area with many stores and restaurants and tourists coming to visit the Great Synagogue and to shop. Tr. 15.

## II.      The September 19, 2002 Tel Aviv Bus Bombing

5.   On September 19, 2002, shortly before 12:55 p.m., Hamas suicide bomber Iyad Radad stepped aboard the number 4 bus near 94 Allenby Street, across from the Great Synagogue, in Tel Aviv.  Ex. 18 at 3, 15 (Translation of Zayar Guilty Plea and Conviction).  Just as the bus started to pull away from the bus stop, the suicide bomber activated the explosive belt he was wearing, causing a massive explosion.  Id.  The September 19, 2002 Tel Aviv bus

---

[2] "Tr." refers to the transcript for the trial in this case.  "Ex." refers to exhibits entered into evidence during the trial.

bombing killed six people, including Rozana Sisso, and injured 84 others.  Ex. 18 at 2-3, 15 (Translation of Zayar Guilty Plea and Conviction).

6.  The 2002 Patterns of Global Terrorism report published by the U.S. Department of State specifically cites the September 19, 2002 suicide bus bombing in Tel Aviv as one of the significant terrorist incidents that occurred in 2002 and indicates that Hamas claimed responsibility for the attack.  Ex. 19 at 92, App. A. (United States Department of State, Office of the Coordinator for Counterterrorism, Patterns of Global Terrorism 2002 (Apr. 2003) (hereinafter "2002 Patterns of Global Terrorism"), available at http://www.state.gov/documents/organization/20177.pdf). [3]

7.  Rozana Sisso's eldest son Moshe Siso was present at the scene of the September 19, 2002 terrorist bus bombing that killed his mother.  In his testimony before this Court, Mr. Siso recounted the horrific events of this bus bombing.  Tr. 22-24.  Mr. Siso testified that he went to work in his shop that day, arriving at his usual time of around 10:00 a.m.  Tr. 22. His mother Rozana Sisso was already in her shop next door when he arrived that morning, and Mr. Siso said good morning to her.  Id.  Mr. Siso testified that before he went to lunch, at about 1:00 p.m., he heard a "big explosion."  (Tr. 22-23.)  At the time, Mr. Siso was standing outside of his shop on the sidewalk, looking in his shop window.  As Mr. Siso testified:

> I heard a big bomb, and it gets black and a big ball of fire.
> Something terrible.  You can't describe it.  Very terrible.  Shouting.
> 'Help.'  Something terrible.  You never saw something like this.
>
> . . .
>
> I saw like black.  Everything get black and I fell down on the floor,
> on the sidewalk, and it take me a few minutes and then I wake up.

---

[3] This is a highly regarded report that the Secretary of State is required by law to provide to Congress each year. See 22 U.S.C. § 2656f(a); Ex. 20 at ¶ 27 (Clawson Aff.).  This annual State Department report was entitled "Patterns of Global Terrorism" until 2004, at which time the publication's name was changed to "Country Reports on Terrorism."  Id. at ¶ 27 n.1.

> Saw blood.  I can't describe it.  It was [more] horrible than you
> ever think in your mind.  Very, very hard.  People were on the
> floor, on the sidewalks, hands, legs.  I think I maybe saw a head.
> Something terrible, terrible.  You can't describe this.

Tr. 23.

8.  Mr. Siso said that he could see the bus from where he was, and that the bus was like "a skeleton of a bus."  Tr. 24.  He described the scene as "people shouting, the blood, the people on the floor, hands . . . ."  Tr. 25.

9.  Mr. Siso authenticated photographs of the bomb scene that were taken after the injured people and dead bodies had been removed from the bus.  Exs. 5-9; Tr. 24-28.  As he testified:

> This is the bus.  This is the bus, but again, you don't see the people,
> you don't see the blood.  You don't see the shouting.  Never in my
> life I saw something so terrible, never.

Tr. 26.

10. Mr. Siso saw rescuers arrive on the scene.  He testified that he "saw them coming, . . . collecting people's parts from the floor to try to make a man from it.  Something terrible."  Tr. 24.  Mr. Siso described watching the "holy people," religious Jews who collect all kinds of body parts.  He explained that the "holy people . . . come in after [a] bomb and collect[] parts, hand, leg, [and] try to make something, to make a man from it, to find out who is this.  A hand with rings, something."  Tr. 28.

11. Mr. Siso was eventually taken to the hospital in an ambulance, where he stayed for two days because he was in a state of shock from the overwhelming violence of the bombing.  Tr. 24.

12. At the time of the bombing, Mr. Siso did not realize that his mother had been killed in the blast.  He testified that "I saw my mother's store closed, so I was relieved.  Her lights were on but she was closed, so I thought she's not here.  I was relieved."  Tr. 24.

13. It was not until the next day that Mr. Siso learned that his mother Rozana Sisso had been killed in the bombing.  He testified that his wife came to his hospital room with a psychologist to inform him that his mother had been killed in the bombing.  Tr. 30.

### III.    Responsibility of Hamas for the September 19, 2002 Tel Aviv Bus Bombing

14. Members of the terrorist organization Hamas planned, organized and carried out the September 19, 2002 Tel Aviv bus bombing.  To begin with, Hamas claimed credit for the attack in the public press after the bombing.  See Ex. 21 at ¶ 27 (Hamilton Aff.); Ex. 19 at 92, App. A. (2002 Patterns of Global Terrorism).

15. In addition, in Jerusalem District Court in Israel, Ashraf Zayar, one of the three Hamas operatives who participated directly in the September 19, 2002 Tel Aviv bus bombing, pled guilty to six counts of murder and 84 counts of attempted murder, corresponding to the number of victims who were killed and injured in this attack.   Ex. 18 at 2-3, 15 (Translation of Ashraf Zayar Guilty Plea and Indictment). Ashraf Zayar was also convicted of (1) membership in a terrorist organization, specifically Hamas, (2) three counts of providing aid to the enemy in a time of war; (3) conspiring to commit murder; and (4) weapons crimes.  Ex. 18 at 15-16 (Translation of Ashraf Zayar Conviction).

16. The facts that were admitted by Ashraf Zayar during the course of his plea established that:

a)  Ashraf Zayar was a member of Hamas.

b)  He was recruited into Hamas by Mahmud Hamad Sharita, who is known as "Abu Bahar," to "locate places for carrying out terrorist acts -- places that

would have great potential for the maximum number of victims . . . [and] to lead the suicide bombers to these sites."

c)  Zayar "traveled many times to Tel Aviv in order to locate a site that would be suitable for carrying out a suicide bombing that would result in many victims." He "noticed that on Allenby Street there are many people at bus stations, and he therefore decided that the place was a suitable location for carrying out a terrorist act."

d)  "In accordance with the instructions of Abu Bahar, on the day of the terrorist act, the defendant met with Iyad Radad, who at that point already wore an explosive belt on his person.  [He] transported Iyad Radad to [his] apartment, where Iyad Radad was photographed with the video camera.  The two left the apartment at 8:30 A.M.  in [Zayar's] car, a Volkswagen, with [Zayar] driving. [Zayar] transported Iyad Radad to Allenby Street in Tel Aviv and directed him to blow himself up at a place where there are many people."

Ex. 18 at 1-3, 15 (Translation of Zayar Guilty Plea and Indictment).

17. The affidavit testimony provided by two Middle East experts — Dr. Patrick Clawson, Deputy Director for Research of the Washington Institute for Near East Policy and an expert in Iranian politics, the Iranian economy, and Iranian sponsorship of terrorism, and Mr. Christopher Hamilton, a former Federal Bureau of Investigation ("FBI") agent specializing in Counterterrorism and Palestinian Rejectionist Groups and former Senior Fellow in Terrorism Studies at the Washington Institute for Near East Policy — established that Hamas is a terrorist organization that engages in violence against the people of Israel in furtherance of its goals of eliminating the State of Israel and establishing an Islamist state in the region, that Iran and MOIS were aware of Hamas's terrorist activity, and that they intentionally provided material support in furtherance of that terrorist activity in the years leading up to and including 2002, when passenger bus number 4 was attacked by Hamas in Tel Aviv.[4]   See generally Exs. 20-21 (Clawson Aff. and Hamilton Aff.).

---

[4]Based on their backgrounds, experience and other qualifications, the Court finds Dr. Patrick Clawson and Christopher Hamilton qualified to testify as experts on Middle East terrorism.

18. Mr. Hamilton testified that Hamas is a terrorist organization "that emerged in December 1987 as an outgrowth of the Palestinian branch of the Egypt-based Islamic Brotherhood.  HAMAS was founded with the goal of eliminating the State of Israel and establishing in its place an Islamist state in all of the territory that comprises Israel, the West Bank, and the Gaza Strip."  Ex. 21 at ¶ 9 (Hamilton Aff.); <u>see also</u> Ex. 20 at ¶ 13 (Clawson Aff.). "HAMAS's slogan, as stated in Article 8 of the group's Covenant, published in 1988, reflects that violent <u>jihad</u> — religious-sanctioned violent struggle against perceived enemies of Islam — is central to the group's goal:  'Állah is its target, the Prophet is its model, the Koran is its constitution:  Jihad is its path and death for the sake of Allah is the loftiest of its wishes.'"  Ex. 21 at ¶ 12 (Hamilton Aff.) (quoting the Hamas Covenant).

19. Hamas "engages in military and terrorist activities and attacks that target Israeli civilians and soldiers.  The military wing of HAMAS is known as the Izzedin al-Qassam, or 'Qassam Brigades,'" and it "is the terrorist apparatus of HAMAS."  Ex. 21 at ¶ 10 (Hamilton Aff.).

20. As Mr. Hamilton testified in his affidavit:

Since its founding in 1987, HAMAS has committed countless acts of violence against both military and civilian targets, including suicide and other bombings, and rocket, mortar fire and shooting attacks.  The group is best known for its suicide bombing attacks, and with the onset of what is referred to as the 'Second Intifada' in September 2000, the pace of HAMAS's attacks on Israeli targets increased dramatically.  Between September 2000 and March 2004, HAMAS executed 52 suicide attacks in Israel, killing 288 people and wounding 1,646 more.  In total during this period, HAMAS conducted 425 terrorist attacks that killed 377 people and wounded 2,076.

Ex. 21 at ¶ 13 (Hamilton Aff.) (citing Matthew Levitt,[5] <u>HAMAS: Politics, Charity, and Terrorism in the Service of Jihad</u>, 12 (2006)).

21. The U.S. Department of State lists Hamas as a "Designated Foreign Terrorist Organization." <u>See</u> Ex. 19 at 99, 107, App. B (2002 Patterns of Global Terrorism); Ex. 20 at ¶ 33 (Clawson Aff.); Ex. 21 at ¶ 11 (Hamilton Aff.).

22. The guilty plea and conviction of Ashraf Zayar by the Jerusalem District Court establish Hamas's participation in the September 19, 2002 Tel Aviv bus bombing. Ex. 18 at 1-3; 15 (Translation of Zayar Guilty Plea and Conviction).

23. Hamas leaders knew about the September 19, 2002 attack before it occurred and supported and celebrated the success of the terrorist attack. Ex. 24A, 24B (Wedding Video and Translation). Hamas leader Sheikh Mohammad Siyam was videotaped giving a speech at a group wedding ceremony that took place in Yemen on September 19, 2002, the same date as the bus bombing in Tel Aviv. <u>Id.</u>; <u>see also</u> Ex. 21 at ¶ 30 (Hamilton Aff.) (identifying Siyam as a "known HAMAS leader"). In his speech, Sheikh Siyam describes what he refers to as "Hamas's operation in Tel Aviv," explains that "it will occur today," and states that the "wedding" in Yemen was timed to "coincide with the wedding over there." Ex. 24B at 4 (15:53). Mr. Siyam calls the terrorist attack "[a]n organized operation, that, God willing, you will read about in the newspapers tomorrow and hear about in the media." <u>Id.</u> at 4 (16:10). He stated that "[i]t brought down a large number of the invaders and occupiers, thanks be to God." <u>Id.</u> at 4 (16:19).

---

[5] Dr. Matthew Levitt, the deputy assistant secretary for intelligence and analysis at the U.S. Treasury Department and former senior fellow and director of terrorism studies at the Washington Institute for Near East Policy has served as an expert witness on terrorism in other federal cases, including <u>United States v. Al-Moayad</u>, No. 03-1322 (E.D.N.Y. July 28, 2005); <u>Boim v. Quranic Literacy Inst.</u>, No. 00 C 2905, 2005 WL 433463 at *4 (N.D. Ill. Feb. 18, 2005) (noting "the testimony of Matthew Levitt, the Boims' terrorism expert, who explained to the jury how terrorist networks such as Hamas operate"); and <u>United States v. Hammoud</u>, No. 00-147 (W.D.N.C. May 21, 2002) (order denying motion to exclude expert testimony of Matthew Levitt and other experts and granting motion of intent to offer expert testimony by Matthew Levitt and others).

24. Hamas uses the term "wedding" to refer to a terrorist operation or to a suicide bomber, as "symbolic of a suicide bomber being wed to the cause or wed to God." Ex. 21 at ¶ 29 (Hamilton Aff.).

25. This wedding video reflects, and Middle East expert Christopher Hamilton (who watched the video and read the transcript) confirms, that Hamas leaders knew about the September 19, 2002 terrorist attack in Tel Aviv before it even took place, from which one can infer that Hamas leaders participated in planning and organizing the terrorist attack. Id. at ¶ 30.

## IV.    Responsibility of Iran and MOIS for the September 19, 2002 Tel Aviv Bus Bombing

26. Defendant Iran is a foreign state that was designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) on January 19, 1984, and remains so designated today.  Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261, 273 (D.D.C. 2005) (hereinafter "Dammarell IV"); 22 C.F.R. § 126.1(d) (2006); 31 C.F.R. § 596.201 (2006); Ex. 20 at ¶ 27 (Clawson Aff.).

27. "MOIS, Iran's intelligence service, is an agent of Iran in Iran's support of HAMAS and is the principal Iranian agency designated by Iran to help organize Iranian government support to HAMAS . . . ."  Ex. 20 at ¶ 29 (Clawson Aff.).

28. Iran and MOIS provided material support and resources to Hamas, in the form of military training, weapons and funding during all relevant times leading up to the September 19, 2002 Tel Aviv bus bombing.  See Ex. 20 at ¶¶ 15-26, 28-31, 34-43 (Clawson Aff.); Ex. 21 at ¶¶ 19-21, 24-27 (Hamilton Aff.).

29. "HAMAS and Iran, including MOIS, share a joint goal to carry out violent terrorist attacks aimed at the Israeli civilian population, with the intent to impede any political resolution of the Israeli-Palestinian conflict by peaceful means."  Ex. 20 at ¶ 24 (Clawson Aff.); Ex. 21 at ¶ 26 (Hamilton Aff.).

30. Defendants have a longstanding agreement to further this goal, which extends back to 1993, when Iran, through the Iranian Revolutionary Guard and Hezbollah, "a terrorist organization that is controlled and funded by Iran," began providing military training to members of Hamas who had been arrested by the Israeli government and expelled across the border into south Lebanon in late 1992.  See Ex. 20 at ¶ 15 (Clawson Aff.); Ex. 21 at ¶ 23 (Hamilton Aff.). The exiled Hamas members received Iran-supported military training in camps in both Lebanon and Iran. Id.  at ¶ 24.

31. According to Dr. Clawson, "Iran was extremely interested in forging a close relationship with HAMAS, because it saw the Palestinian group as a means of achieving direct Iranian involvement in the Israeli-Arab conflict."  Ex. 20 at ¶ 17 (Clawson Aff.).

32. When international condemnation forced Israel to allow the Hamas deportees to return a year later, "[t]he returning HAMAS members, armed with professional, Iranian-supplied training in munitions and explosives, quickly established operational and organizational infrastructure far more deadly and effective than that which HAMAS had previously been capable of maintaining."  Ex. 20 at ¶ 20 (Clawson Aff.).

33. Since that time, "many scores of additional HAMAS operatives from the West Bank and Gaza have received Iranian military and other training at bases in Lebanon and in Iran itself, thus further bolstering HAMAS's operational capabilities."  Ex. 20 at ¶ 21 (Clawson Aff.).

34. "Iran has also provided HAMAS with weapons including, but not limited to, explosives, automatic weapons, ammunition, hand grenades, shoulder fired missiles, rockets and launchers, as well as the training required to use these weapons."  Ex. 20 at ¶ 22 (Clawson Aff.); see also Ex. 21 at ¶ 24 (Hamilton Aff.).

35. Iran also regularly gives Hamas financial support through funding provided by Iran's agent, MOIS.  Ex. 20 at ¶¶ 29, 39 (Clawson Aff.); Ex. 21 at ¶ 21 (Hamilton Aff.).   MOIS is reputed to have an annual budget of between $100 and $400 million.  Ex. 20 at ¶ 30 (Clawson Aff.).  Dr. Clawson testified that he believed Iran's support for Hamas "in 2000-2002 was at least several million dollars per year, if not more."  Id. at ¶ 39.  Estimates of the magnitude of Iran's funding of Hamas range from $3 million a year as of 2005 (according to Israeli estimates) to $20 to $50 million a year between 1990 and 2000 (according to experts testifying in Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 262 (D.D.C. 2003)).  Ex. 20 at ¶ 39 (Clawson Aff.) (citing Levitt, at 172).  This funding reportedly is "directed straight to [Hamas's] operational units."  Id. ¶ at 41 (citing Levitt, at 174).

36. Documents seized from the Palestinian Authority by the Israeli government in 2002 provide further evidence of Iran's financial support for Hamas's terrorist activities.  Ex. 20 at ¶¶ 42-43 (Clawson Aff.).  "For example, an intelligence report dated December 10, 2000, delivered by the head of the Palestinian General Intelligence, Amin al-Hindi, provides information about the transfer of large sums of money to the Palestinian territories by Iran, including $400,000 to HAMAS's al-Qassam Brigades, HAMAS's terrorist wing."  Id. at ¶ 43 (Clawson Aff.).  The document specified that "the funds were provided to support the HAMAS military organization and to encourage suicide operations."  Id.

37. "Iran has long supported suicide bombings committed by HAMAS."  Id. at ¶ 36.  In his affidavit, Dr. Clawson testified that in the mid-1990s Palestinian Authority Chairman Yasser Arafat went so far as to state that Iran 'ordered' suicide bombings.  Id.  According to Dr. Clawson:

> Over the past thirteen years, HAMAS has carried out dozens of massive bombing attacks against civilians in Israel using

operational and technical capabilities that are a direct product of
Iranian-supplied training, as well as many other smaller scale
attacks, some of which use techniques which suggest Iranian
training.  An example of one of HAMAS' larger bombing attacks
was the Tel Aviv bus bombing of September 19, 2002.  The level
of sophistication in bomb making, in planning, and in execution of
that attack are all consistent with the sort of advanced training that
Iran has supplied to HAMAS over the years leading up to 2002.

Id. at ¶ 23.

38. Iran's relationship with Hamas and their shared terrorist objective is openly
announced by defendants.  According to the U.S. State Department's 2002 Patterns of Global
Terrorism report, in 2002, the year Rozana Sisso was killed, "Supreme Leader Khamenei
referred to Israel as a 'cancerous tumor,' a sentiment echoed by other Iranian leaders in speeches
and sermons."  Ex. 19 at 77 (2002 Patterns of Global Terrorism).  The 2002 report went on to
state that Iran matched "this rhetoric with action, by providing "Palestinian rejectionist groups—
notably HAMAS . . . with funding, safehaven, training, and weapons."  <u>Id.</u>  "Tehran also
encouraged . . . Palestinian rejectionist groups to coordinate their planning and to escalate their
terrorist activities against Israel."  <u>Id.</u>  The 2002 Patterns of Global Terrorism report specifically
mentions the role of MOIS "in the planning of and support for terrorist acts."  <u>Id.</u>

## V.      Plaintiff's Injury and Damages

39. As a result of the violent death of his mother, Rozana Sisso, in the September
19, 2002 Tel Aviv bus bombing, Avraham Sisso suffered, and continues to suffer, severe
emotional distress.  Tr. 50-64.

40. Mr. Sisso had a close relationship with his mother.  In describing his
relationship with his mother, Mr. Sisso testified:

I think I had a very special relationship [with my mother].  When I
grew up, they kind of used to say that I'm the favorite kid, and I
think that I had a different relationship than all the rest of the
siblings.  I was always the kid that was a good kid, didn't get in

> trouble, you can count on, and so . . . my relationship with my mother was the one that she would come to me to talk to me, to sometimes seek my advice, sometimes I would ask her for advice.
>
> I think it was kind of like an equal relationship.  While with the rest of the kids in the family, she was definitely the protective one with them.  So . . . I think that we had a unique relationship, my mother and I.

Tr. 45.

41. Although he moved to the United States when he was 25 years old, Mr. Sisso maintained a close relationship with his mother.  In fact, his  mother "played a major role in [his] decision to move to the United States."  Tr. 45.  He testified that "she was the one that was pushing me to go and visit the United States first, and after that, she had a major role in it. . . . She was probably the main cause for me being over here."  Tr. 46.  After Mr. Sisso moved to the United States, he talked with his mother about "every other week" and when they talked, they talked "for a long time."  Tr. 47.

42. Mr. Sisso's parents had considered moving to the United States themselves. Tr. 46.  Mr. Sisso testified that "they both got green cards and they were thinking about trying to move over here."  Id.

43. Mr. Sisso testified that he would try to see his mother every year, although it did not always work.  Tr. 47.  Either Mr. Sisso's family would travel to Israel or his parents would come to the United States.  Id.  During the visits, the family would frequently take vacations together.  Id.  The family traveled to places like Atlantic City, Washington D.C. and Baltimore together.  Id.

44. Mr. Sisso's parents, Rozana and Charles Sisso, visited Mr. Sisso and his family in the United States in June 2002, just three months before Rozana Sisso was killed in the terrorist bombing.  Tr. 48, Ex. 14 (Video of Rozana Sisso in Portland, Maine in June 2002).  On

that visit, Mr. Sisso's parents traveled with him and his family to Portland, Maine and Montreal, Quebec.

45. The evidence presented in the photographs from the family trip and the video taken in Portland, Maine, as well as Avraham Sisso's testimony, shows that Rozana Sisso was enjoying the time getting to know her granddaughters and was looking forward to spending more time with Avraham Sisso and her granddaughters in the future.  See Exs. 12-14, Tr. 48-49, 62-64.

46. Three months after Rozana Sisso's visit to see her son Avraham Sisso and his family, on September 19, 2002, Mrs. Sisso was killed in a violent terrorist attack that took place outside of her store.

47. Mr. Sisso was just finishing a day of meetings in Massachusetts, where he was visiting for business, when he received the call from his wife Cindy notifying him that his mother had been killed in the bus bombing.  Mr. Sisso lived in New Jersey at the time.

48. Mr. Sisso testified that:

the secretary called me and told me that my wife was on the phone. . . . At first she said -- asked me to first sit down.  And after that she just went ahead and told me that my mother was killed.

. . .

The first thought was shock and disbelief. . . . I thought she was wrong.  I couldn't believe that she was saying what she was saying. I don't know.  I think they mentioned also my brother, but I couldn't grasp it.  I was in shock.  I got this news and I was in shock, and I think I'm in shock ever since.  I still don't know how to accept it.

So . . . when she told me that, I kind of blacked out type of a thing. Everything kind of stopped at that moment.  And everything after that is like one big confused thing.  I'm not sure exactly how to deal with it.  So it was a combination of fear when I heard it, kind of I got scared, and I never recovered from it.

Tr. 50-51.

49. Mr. Sisso sought to get to Israel as quickly as possible after he learned of his mother's death.  Tr. 51-52.  Although he had driven from New Jersey to Massachusetts for his meetings, he arranged to take a flight that evening from Massachusetts to New Jersey.  Id.  A friend of Mr. Sisso's drove to his house to pick up his passport and deliver it to the airport, and Mr. Sisso immediately boarded a flight for Israel.  Id.

50. Mr. Sisso explained that the reason for much of the urgency was that "in the Jewish religion you have to bury the person as fast as possible."  Tr. 51.  Rozana Sisso was killed on a Thursday, and "the rabbis were pushing very hard to try to have the funeral as soon as possible, on Friday" because the day after would have been "Shabbat, and . . . you cannot have funerals on Shabbat."  Id.  Mr. Sisso testified that "the rabbis . . . were pushing hard to have the funeral, because they[] [said] that if you don't bury the dead, their soul is suffering . . . ."  Id.  Despite flying to Israel as soon as he learned of his mother's death, Mr. Sisso did not arrive until "late on Friday."  Tr. 52.  In the end, he and his family made the difficult decision to wait until Mr. Sisso could be present for the funeral.  Id.  As Mr. Sisso testified:

> They waited for me to be there, and the funeral was done after the Shabbat, even though the rabbis were saying to do it the other way, because we knew 100 percent, no doubt in my mind, that my mother would want me to be there, and all of us to be there.  And even if she suffered for that . . . this is what she would want.

Tr. 52.

51. Mr. Sisso stayed in Israel "for the week of Shiva, which is the week you have to stay at the house, and I was just there for the whole week."  Id.  Most of decedent Rozana Sisso's family sat Shiva at Mr. Sisso's parents' house.  Tr. 53.

52. Mr. Sisso attended his mother's funeral, which was held on Sunday, September 22, 2002.  Mr. Sisso testified that it was a big funeral and that people from the government were there and made some speeches but, as he described:

> I wouldn't be able to tell a word that they said.  I was in shock and I didn't hear anything.  My sister Tobi said a small poem during the funeral.  And again, I wouldn't be able to tell you one word of what she said.  So it was just numbness and being there and just in shock.

Id.

53. For the rest of the weeks he spent in Israel, Mr. Sisso went to the synagogue "every day, twice a day."  Tr. 54.

54. Mr. Sisso testified that his mother's death has changed him significantly.  As he testified:

> I'm not the same person that I was before.  I was a happy person.  I was, I think I was a fun person to be with.  I was doing things, a lot of things with my kids.  I used to coach both my daughters at soccer, so I was the coach.  I used to play with my daughters a lot.  After work I would -- I was the fun dad for my -- all their friends of my kids would say, you know, that he's the fun one.
>
> And ever since, I'm not the fun one.  I'm sad almost all the time.  Every time that I have free time, or that I don't do something, my thoughts are going to that.  It's a feeling that doesn't go away.  It's a feeling that -- everybody's saying that time heals everything, and time, with time it's going to get easier.  And it doesn't get easier.  It stays the same.  It was horrible then and it's not less horrible now.  It's exactly the same.  It hurts . . . you're by yourself for a moment, and it goes there.  And your mind goes to that.

Tr. 55; see also Ex. 22 at ¶ 18 (Pastor Aff.) (Dr. Larry Pastor testifying that "sudden or unexpected death leaves little or no time for anticipation, or for psychological 'letting go' of the lost loved one.").

55. Mr. Sisso also testified that he is dealing with his grief and loss by burying himself in his work:

> The way that I'm dealing with it now is that I'm working all the
> time.  I continuously -- when I'm working and I'm busy, I don't
> think about it.  And I'm acting.  So I work 12, 14, 15 hours a day
> all the time, and I don't do much more.

Tr. 56.

56. Mr. Sisso described the feelings of guilt that he has experienced since his

mother's death as follows:

> [S]ince it happened we went once on vacation.  And it was nice.
> And then after that I feel guilty that I had good time.  So even if it
> happens, and after that I kind of feel guilty.

Id.

57. Mr. Sisso also described experiencing feelings of guilt for not trying harder to

bring his mother to the United States:

> I feel guilty because I also feel that maybe I should have brought
> her over here.  And it's maybe kind of my fault a little bit that she
> was there.  Maybe I should have brought her over here.  I should
> have made it easier for her to come here.
>
> So I have the guilt also of maybe you should have done more.  So
> it's a horrible time, ever since it happened, and it doesn't get any
> better up to now.  I don't know what to do.

Tr. 56; see also Ex. 22 at ¶ 21 (Pastor Aff.) (Dr. Pastor testifying that "'Survivor's guilt' is

another psychological state associated with traumatic loss, and it may limit the surviving

person's ability to move beyond the loss of a loved one" due to "a sense of responsibility and a

belief, however unrealistic, that they could have somehow prevented their loved one's death.").

58. Mr. Sisso also testified that he stopped going to school for his MBA, which he

had been working on before his mother's death.  Tr. 56.  He testified that "I don't think I can deal

with it at this point.  So that stopped.  Anything that I used to do, I don't do."  Id.

59. Mr. Sisso testified that his sleep habits have been negatively affected since his mother's death. As he testified, "I don't sleep as well, but I used to be much more active. I used to do things, I used to do physically things, and now I don't do them. So I kind of feel tired." Tr. 57.

60. Mr. Sisso has also been affected by the impact of the loss of his mother on the rest of his family. Before she died, Rozana Sisso was "definitely the center of [the] family. She held everything together . . . ." Tr. 40. Mr. Sisso explained that before her death, Rozana Sisso had taken care of the family financially, and that afterward, Mr. Sisso's father got into financial difficulty and caused Mr. Sisso to have to give his father approximately $65,000 to rescue a business venture he had gotten into. Tr. 59. Mr. Sisso testified that "if my mother was alive [my father] would not be buying that store." Id.

61. Dr. Larry Pastor provided expert testimony regarding the types of emotional distress commonly suffered by the family members of individuals who are killed in terrorist attacks, such as the September 19, 2002 Tel Aviv bus bombing. Ex. 22 (Pastor Aff.). Dr. Pastor is a psychiatrist specializing in the impact of terrorism and natural disasters on mental health, including Post-Traumatic Stress Disorder ("PTSD"). Id. at ¶¶ 3-11. Dr. Pastor previously qualified as an expert on PTSD, specifically relating to the psychological effects of traumatic, violent events such as terrorism, in Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105 (D.D.C. 2003).[6] Ex. 22 at ¶ 10 (Pastor Aff.). Dr. Pastor's testimony confirmed that Avraham Sisso has experienced many of the severe psychological consequences that are typically associated with the surviving family members of victims of terrorist attacks.

---

[6] The Court finds Dr. Larry Pastor qualified to testify as an expert regarding the psychological effects of traumatic, violent events such as terrorism.

62. Dr. Pastor testified that "the death of a loved one due to a traumatic, violent event, such as a terrorist attack . . . can have severe negative psychological consequences to surviving family members." Id. at ¶ 12.

63. According to Dr. Pastor, of all the ways that someone can lose a family member, the most severe negative psychological consequences generally will result for the survivor of a victim "of an intentional, man-made act of violence, such as terrorism" because of its sudden nature, its violent nature, the random nature, the horrific mental imagery (whether real or imagined) that victims are often left with, and "survivor's guilt." Id. at ¶¶ 14-17, 21.

64. Death inflicted by an intentional, terrorist act, such as the September 19, 2002 Tel Aviv bus bombing that killed Rozana Sisso, is frequently characterized by the most severe type of negative psychological consequences to surviving family members of the deceased. Ex. 22 at ¶ 24 (Pastor Aff.) (discussing PTSD, "a characteristic set of signs and symptoms that may follow in the aftermath of a psychological trauma," the most common cause of which "is the sudden loss of a loved one").

65. The types of powerful, negative emotional reactions that may result from traumatic stress and traumatic grief include:

> anxiety, intense sadness, intrusive thoughts or imagery, anger, shame or blame or self-blame, insomnia or tendency to sleep excessively, fatigue, physical discomfort or pain due to anxiety, nightmares, emotional numbing, depression, negativistic world-view, emotional isolation (sometimes resulting in failed relationships), social withdrawal, substance abuse, and suicidal thoughts or violence.

Id. at ¶ 20.  "Traumatic grief can result in an unwillingness or inability of the surviving person to take enjoyment of life, or to participate in certain activities that were part of that person's life prior to the traumatic loss." Id.

66. Another psychological state associated with traumatic loss is "Survivor's guilt." Id. at ¶ 21. Survivor's guilt "may limit the surviving person's ability to move beyond the loss of a loved one . . . . Traumatic loss can impede a surviving family member from enjoying ordinarily pleasant experiences because of the continued presence of pain and guilt." Id.

67. "Additionally, the death of a loved one who served in a role of 'support person' for the surviving individual or family as a whole, by definition, deprives the surviving family members of emotional support at a time when it is most needed.  In addition to the normal grief of losing a parent, the traumatic death of a parent who was a significant 'support person' can result in a breakdown of the family network as a whole." Ex. 22 at ¶ 23 (Pastor Aff.).

68. "Courts have recognized the unique nature of the traumatic loss and traumatic grief that is inflicted on survivors of traumatic death by terrorism.  In considering the extent of the emotional distress suffered and harm done to such individuals, courts have placed special emphasis on the cause of the decedent's death." Id. at ¶ 24.  See, e.g., Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 111 (D.D.C. 2000) ("[W]here the death results from terrorism, for example, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time."); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 31 (D.D.C. 1998) ("[D]eath as a result of terrorism, with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding.").

## PROPOSED CONCLUSIONS OF LAW

### I.      Jurisdiction

This Court addressed the issue of its jurisdiction over defendants Iran, MOIS and Hamas and the claims against them in Sisso, 448 F. Supp. 2d at 81-92.  In that opinion, this

Court concluded that the Court may exercise jurisdiction over Hamas for purposes of the Antiterrorism Act claim and ordered the entry of default against Hamas.  Id. at 90.  The analysis and findings in that opinion should be considered incorporated into this opinion in their entirety. The Court also concluded that the allegations of plaintiff's amended complaint are legally sufficient to support subject matter jurisdiction over the claim against Iran and MOIS, so long as the allegations are proven.  Id. at 82 n.9, 89.  After reviewing the evidence and making the above factual findings on the merits of the claim, the Court concludes that these allegations have been proven and that the Court has subject matter jurisdiction over the claim against Iran and MOIS.

The Foreign Sovereign Immunities Act is "the sole basis for obtaining jurisdiction over a foreign state" in U.S. court.[7]  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); 28 U.S.C. §§ 1602-11.   Under section 1608 of the FSIA, personal jurisdiction is satisfied if service of process has properly been made on the foreign state, and subject matter jurisdiction is satisfied if plaintiff's claim falls within one of the exceptions to sovereign immunity enumerated in section 1605 of the FSIA.   In Sisso, this court found that "plaintiffs have done all that is required of them under section 1608 to effectuate service on Iran and MOIS," Sisso, 448 F. Supp. 2d at 83, and that the allegations in the complaint, if proven, would be sufficient to meet the requirements for applying section 1605(a)(7) — the state-sponsored terrorism exception to the FSIA.  Id. at 85-86.

Section 1605(a)(7) of the FSIA denies sovereign immunity in any case

in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of

---

[7] As the Court noted in Sisso, "[f]or jurisdictional purposes, Iran and MOIS are treated identically-as the state itself." Sisso, 448 F. Supp. 2d at 82 n.6.

such foreign state while acting within the scope of his or her office,
employment, or agency.

28 U.S.C. § 1605(a)(7) (emphasis added).   In order for this section to apply, three other

requirements must also be met: (1) the foreign state must have been designated a state sponsor of

terrorism at the time of the terrorist act or as a result of that act; (2) the foreign state must have

been afforded a reasonable opportunity to arbitrate the claim if the act occurred within the

foreign state against which the claim has been brought; and (3) either the claimant or the victim

must have been a U.S. national at the time of the terrorist act.  Id. § 1605(a)(7)(A)-(B).

　　　All of the requirements for applying section 1605(a)(7) have been met in this

case.  Iran was designated a state sponsor of terrorism in 1984 and has been on the State

Department's list of state sponsors of terrorism ever since, including at the time of Rozana

Sisso's murder.  Dammarell IV, 404 F. Supp. 2d at 273; 22 C.F.R. § 126.1(d) (2006); 31 C.F.R.

§ 596.201 (2006); Ex. 20 at ¶ 27 (Clawson Aff.).  The September 19, 2002 bus bombing did not

occur within Iran's territory, so there was no need for plaintiff to afford Iran an opportunity for

arbitration.  Avraham Sisso, who is a U.S. citizen, fulfills the requirement that either the claimant

or the victim be a United States national at the time when the act upon which the claim is based

occurred.  See Ex. 11; Tr. 34.

　　　The other requirements for denying sovereign immunity to a state under section

1605(a)(7) are also met.  As the Court found in Sisso, "Avraham Sisso's claim against Iran and

MOIS for intentional infliction of emotional distress plainly qualifies as a claim that seeks

money damages for personal injury."  Sisso, 448 F. Supp. 2d at 85.

　　　The details of Hamas member Ashraf Zayar's guilty plea and conviction by the

Jerusalem District Court for his participation in the September 19, 2002 Tel Aviv bus bombing,

the contents of the video of the group wedding in Yemen, and the 2002 Patterns of Global

Terrorism report all support the conclusion that this was a deliberate extrajudicial killing.  See Ex. 18 (Translation of Zayar Guilty Plea and Conviction); Ex. 24B, 24C (Wedding Video and Translation);  Ex. 19 at 92, App. A (2002 Patterns of Global Terrorism).

The testimony and evidence presented establish that Mr. Sisso's injury was caused by the bus bombing carried out by Hamas in Tel Aviv on September 19, 2002.  As this Court found in Sisso:

> [i]t is clear that Rozana Sisso and the other victims of the Tel Aviv bus bombing were deliberately targeted for death and that such deaths were 'not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees,' thus qualifying the bombing as an act of 'extrajudicial killing,' as defined by the Torture Victim Protections Act ("TVPA"), 28 U.S.C. §  1350 note, which is incorporated by reference in the FSIA.

Sisso, 448 F. Supp. 2d at 85 (citing 28 U.S.C. § 1605(e)).

The Court finds that Iran and MOIS knowingly and intentionally provided "material support or resources" to Hamas and its operatives, in the form of funding, training, weapons and safehaven, specifically for the purpose of furthering acts of extrajudicial killing such as the September 19, 2002 Tel Aviv bus bombing that killed Rozana Sisso.  See Ex. 20 at ¶¶ 15-26, 28-31, 34-43 (Clawson Aff.); Ex. 21 at ¶¶ 19-21, 24-27 (Hamilton Aff.); Ex. 19 at 77 (2002 Patterns of Global Terrorism).  Moreover, plaintiff Sisso has established sufficient causal link between the material support and the injuries underlying his claim against Iran and MOIS.  See Sisso, 448 F. Supp. 2d at 12-13 & n.12 (proof that the material support or resources went *directly* to the particular act that gave rise to the claim is not required).  As Dr. Clawson testified in his affidavit, "[w]ithout the technical training, funding, cash incentives and other material support provided to HAMAS by Iran and MOIS, HAMAS would not have been able to fund and carry out massive bombing attacks in Israeli cities, such as the bombing of Bus No. 4 in Tel Aviv

on September 19, 2002." Ex. 18 at ¶ 44 (Clawson Aff.).  The Court therefore finds that plaintiff

has proven facts sufficient to overcome sovereign immunity.

## II.    Liability

Having concluded that Iran and MOIS are not immune from suit, the Court now

turns to the issue of liability.

### A.    Hamas

Outside of the context of the FSIA, under which a plaintiff must establish "his

claim or right to relief by evidence satisfactory to the court" before a default judgment may be

entered against a foreign state or agency of a foreign state, see 28 U.S.C. § 1608(e), "default

establishes the defaulting party's liability for the well-pleaded allegations of the complaint."

Rubin v. Hamas, No. 02-975, 2004 WL 2216489 at *2 (D.D.C. Sept. 27, 2004); see also Franco

v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999) ("A party who defaults is taken to have

conceded the truth of the factual allegations in the complaint as establishing the grounds for

liability as to which damages are calculated."); Brock v. Unique Racquetball & Health Clubs,

Inc., 786 F.2d 61, 65 (2d Cir. 1986) (noting that "default concludes the liability phase of the

trial").  Through plaintiff's adequately pleaded Amended Complaint, plaintiff has established a

prima facie case against Hamas for intentional infliction of emotional distress under the

Antiterrorism Act of 1991.  See Am. Compl. ¶¶ 41-48.

The Antiterrorism Act authorizes "[a]ny national of the United States injured in

his or her person, property, or business by reason of an act of international terrorism, or his or

her estate, survivors, or heirs" to sue in any U.S. district court for treble damages, as well as

costs and attorneys fees.  18 U.S.C. § 2333(a).  Plaintiffs may recover under this provision for

their nonphysical injuries, such as emotional distress, as a result of international terrorist acts

against relatives who are not U.S. nationals.  See Biton v. Palestinian Interim Self-Government

Auth., 310 F. Supp. 2d 172, 181-82 (D.D.C. 2004); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 588-89 (E.D.N.Y. 2005) (allowing the claims of "U.S. nationals suing based on their nonphysical injuries resulting from acts of international terrorism" to proceed with the ATA claim).  In light of defendant Hamas's lack of response to the complaint, this Court ordered the entry of default, see Sisso, 448 F. Supp. 2d at 86, 92.  Thus, Hamas' liability has been established.

The Court notes that, although not required for a default judgment, plaintiff also has proven the Amended Complaint's allegations with respect to Hamas.  In order to bring a claim under the ATA, the plaintiff must be a U.S. national.  See 18 U.S.C. § 2333(a); Biton, 310 F. Supp. 2d at 181 (allowing U.S. citizen who was the widow of a non-U.S. national killed in an international terrorist attack to sue "as the principal victim herself").  Avraham Sisso is currently a U.S. citizen and was a U.S. citizen when HAMAS carried out the Tel Aviv bombing, in which his mother was killed.

In addition, Mr. Sisso's injury was proximately caused by an act of international terrorism.  Biton, 310 F. Supp. 2d at 182 ("[T]he clause 'by reason of' … require[s] a showing of proximate cause."); Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1011-12 (7th Cir. 2002) ("The Supreme Court has interpreted the identical language ["by reason of"] to require a showing of proximate cause.") (citing Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 265-68 (1992)).  The ATA defines an act of international terrorism as "violent acts" that are "dangerous to human life" that (a) violate U.S. federal or state law, (b) are intended "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping," and (c) take place outside the United States.  18 U.S.C. § 2331(1).

The Tel Aviv bombing, which resulted in the death of Rozana Sisso, qualifies as an act of international terrorism.  The bombing, which killed six individuals and injured 84 others, (i) was a violent act that was dangerous to human life and a violation of U.S. law; (ii) was intended to intimidate and coerce the Israeli civilian population as well as influence the Israeli and U.S. governments through this intimidation; and (iii) occurred outside of the United States.

Finally, as a result of the bombing that killed his mother, Avraham Sisso was "injured in his . . . person."  Mr. Sisso has suffered severe emotional distress by reason of the defendants' conduct.  As the evidence shows, Mr. Sisso suffered immediate and severe distress when he learned that his mother had been killed in the September 19, 2002 Tel Aviv bus bombing.  The evidence also shows that Mr. Sisso continues to suffer from severe emotional distress, and that this emotional distress has significantly impacted his life.

Plaintiff, thus, has proven his ATA claim against Hamas.  The Court now turns to the liability of Iran and MOIS.

**B.      Iran and MOIS**

**1.      Proper Cause of Action**

In Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004), the D.C. Circuit held that "[s]ection 1605(a)(7) merely waives the immunity of a foreign state without creating a cause of action against it."  See also Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004) ("[A] plaintiff proceeding under the FSIA must identify a particular cause of action arising out of a specific source of law."); Dammarell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090, at *7 (D.D.C. Mar. 29, 2005) ("Section 1605(a)(7) only removes the immunity of a foreign state; it does not itself describe a cause of against the foreign state.") (hereinafter "Dammarell II").

Section 1606 of the FSIA provides that foreign states "shall be liable in the same manner and to the same extent as a private individual under like circumstances" on any claim for which they are not entitled to immunity under section 1605.  28 U.S.C. § 1606.  Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law.  See Dammarell II, 2005 WL 756090 at *8-10.  The District of Columbia provides the choice of law rules under these circumstances.  See id. at *18; Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 114 (D.D.C. 2005).  For cases in which the plaintiff is a survivor of the injured victim, the plaintiff's domicile determines the governing law, Dammarell II, 2005 WL 756090, at *21, and the plaintiff's domicile should be determined at the time the event occurs.  Id. at *22.

Applying these standards, Avraham Sisso's claims against Iran and MOIS should be governed by New Jersey law because he was domiciled in New Jersey at the time of his mother's death.  Plaintiff's Amended Complaint states a cause of action against Iran and MOIS for intentional infliction of emotional distress ("IIED") under New Jersey state law.  As discussed below, this is a proper common law cause of action under New Jersey law for which private individuals may face liability.

## 2. Intentional Infliction of Emotional Distress

In order to establish a claim for intentional infliction of emotional distress under New Jersey law, the plaintiff must prove that (1) "the defendant acted intentionally or recklessly;" (2) "the defendant's conduct [was] extreme and outrageous;" (3) "the defendant's actions [were] the proximate cause of the plaintiff's emotional distress," and (4) "the emotional distress suffered by the plaintiff [is] 'so severe that no reasonable man could be expected to endure it."  Buckley v. Trenton Saving Fund Soc'y, 544 A.2d 857, 863 (N.J. 1988) (citing Restatement (Second) of Torts § 46 cmt. d (1965)) (citations and quotations omitted);  see also

Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 104-05 (D.D.C. 2006) (finding that Iran and MOIS's provision of material support to Hamas constituted intentional infliction of emotional distress under New Jersey law, where survivors' family member was killed in a suicide bombing committed by Hamas in Jerusalem).

All of the elements of intentional infliction of emotional distress have been proven in this case.  First, the plaintiff has proven that defendants acted intentionally, "both to do the act and to produce emotional distress."  Buckley, 544 A.2d at 863.  The evidence shows that Iran and MOIS intentionally provided material support and resources to Hamas with the intent that Hamas would carry out terrorist attacks that would cause severe emotional distress to the families of the victims.  As this Court noted in Salazar, "[c]ourts have uniformly held that a terrorist attack — by its nature — is directed not only at the victims, but also at the victims' families."  Salazar, 370 F. Supp. 2d at 115 n.12 ("A terrorist attack on civilians is of course intended to cause emotional distress to the victims' families.") (citation omitted); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35 (D.C. Cir. 2001) ("If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present, no essential reason of logic or policy prevents liability."); Ex. 20 at ¶ 15 (Hamilton Aff.) (Hamilton testifying that "HAMAS's attacks are indiscriminate in nature and are intended to terrorize not only the targeted individuals, but also . . . the surviving relatives and friends of HAMAS's victims, Israeli or otherwise.").

Second, "the act of engaging in terrorism by means of material support and civil conspiracy is extreme, outrageous, and goes beyond all possible bounds of decency."  Greenbaum, 451 F. Supp. 2d at 104; see also Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 70 (D.D.C. 2006) ("[A] terrorist attack constitutes extreme and outrageous conduct.");

Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) ("[A]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.").

Third, defendants' actions were the proximate cause of plaintiff's emotional distress.  The severe emotional distress experienced by family members of terrorism victims, such as the mental anguish Avraham Sisso has suffered due to the loss of his mother in the bombing, was clearly a foreseeable, natural and, in fact, intended result of the material support Iran and MOIS provided to Hamas in furtherance of Hamas's terrorist activities in Israel.

Fourth, plaintiff has established "distress that is severe." Buckley, 544 A.2d at 863.  In a recent case, the Superior Court of New Jersey determined that "[i]t is not necessary that the plaintiff suffer physical manifestations of the emotional distress, although accompanying physical manifestations are relevant both in proving that the emotional distress was severe and substantial and in assessing the quantum of damages." Boryszewski ex rel. Boryszewski v. Burke, 882 A.2d 410, 434 (N.J. Super. Ct. App. Div. 2005) (quoting Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 822 A.2d 647, 650 n.1  (N.J. Super. Ct. App. Div. 2003), rev'd on other grounds, 181 N.J. 70 (2004) (clarifying that "[c]ompensable emotional stress in the tort context . . . need not be accompanied by physical manifestations.")).

As the evidence shows, the horrific terrorist bombing that killed Rozana Sisso caused immediate and severe emotional distress and mental anguish for Avraham Sisso.  It has also been established that Mr. Sisso has continued to experience severe emotional distress since that time due to the fact that his mother was taken away from him in such a sudden, violent, and malicious manner.  The symptoms of severe post-traumatic emotional distress that Mr. Sisso has experienced and continues to experience include anxiety, stress, emotional numbing, intense

sadness, fatigue, and social withdrawal, as well as an inability to take enjoyment in life and survivor's guilt.  See Tr. 51-60, 63-64.  Dr. Pastor, an expert in the field of psychological trauma and the severe psychological impact of terrorism on the families of victims, testified that traumatic loss and traumatic grief will result in symptoms such as Mr. Sisso has experienced.  Ex. 22 at ¶¶ 20-21 (Pastor Aff.).  Dr. Pastor also testified that "[d]eath inflicted by an intentional terrorist act, such as the Tel Aviv terrorist suicide bus bombing that killed Rozana Sisso, is frequently characterized by the most severe type of negative psychological consequences to surviving family members of the deceased."  Id. at ¶ 24.  Thus, the Court finds that Avraham Sisso has proved his claim of intentional infliction of emotional distress against Iran and MOIS.

### 3.    Vicarious Liability

Plaintiff contends that Iran and MOIS may be held liable for the September 19, 2002 Tel Aviv bus bombing perpetrated by Hamas under theories of vicarious liability — including both civil conspiracy and aiding and abetting — because Iran and MOIS provided material support and resources to Hamas for the purpose of facilitating such attacks.  One party may be liable for the acts of another under various theories of vicarious liability, including aiding and abetting, civil conspiracy, and agency.  This Court finds that both civil conspiracy and aiding and abetting provide a basis of liability for defendants Iran and MOIS.  Courts have repeatedly held Iran and MOIS vicariously liable for the terrorist acts of Hamas.  See, e.g., Greenbaum, 451 F. Supp. 2d at 102; Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74 (D.D.C. 2006); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003); Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286 (D.D.C. 2003); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13 (D.D.C. 2002); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1 (D.D.C. 2000).

a)      **Civil Conspiracy**

Under New Jersey law, "a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Banco Popular North Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005) (quoting Morgan v. Union County Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993)); see also Greenbaum, 451 F. Supp. 2d at 102 (same).  The participants need not have an express agreement nor possess the same motives for there to be a civil conspiracy, but "they must share the general conspiratorial objective." Weil v. Express Container Corp., 824 A.2d 174, 183 (N.J. Super. Ct. App. Div. 2003); see also Banco Popular, 876 A.2d at 177 ("It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.").  The agreement may be inferred from the conduct of the alleged co-conspirators. Greenbaum, 451 F. Supp. 2d at 102 (citing Morgan, 633 A.2d at 998).  Finally, for civil conspiracies under New Jersey law, "once a . . . conspiracy is formed, each conspirator while a member [of the unlawful combination] is liable for every act and declaration of each and all of the conspirators, done or made in the pursuance of . . . the conspiracy." Morgan, 633 A.2d at 999 (citations omitted).

The evidence presented in this case by Middle East experts Dr. Patrick Clawson and Christopher Hamilton clearly establishes that defendants Hamas and Iran, including MOIS, "share a joint goal to carry out violent terrorist attacks aimed at the Israeli civilian population, with the intent to impede any political resolution of the Israeli-Palestinian conflict by peaceful means."  Ex. 20 at ¶ 24 (Clawson Aff.); Ex. 21 at ¶ 26 (Hamilton Aff.).  One can infer from defendants' actions that they have a longstanding relationship that began in the early 1990s,

when Iran and MOIS began providing Hamas with training, weapons and funding to assist them in carrying out terrorist attacks in furtherance of defendants' common objectives.

It is undisputed that Hamas perpetrated the September 19, 2002 suicide bombing aboard passenger bus number 4 in Tel Aviv that killed Rozana Sisso. Likewise, there is no question that this horrific act of extrajudicial killing was unlawful and intended to inflict injury on others. It also has been established that the September 19, 2002 terrorist attack was committed in furtherance of the common scheme between Hamas and Iran and the Iranian MOIS. The elements of civil conspiracy have, therefore, been established.

This Court notes that a civil conspiracy was been found to exist between Hamas and Iran and MOIS under very similar circumstances in <u>Greenbaum v. Islamic Republic of Iran</u>. <u>See</u> <u>Greenbaum</u>, 451 F. Supp. 2d at 102 (finding that civil conspiracy provided a basis of liability for Iran and MOIS for the material support they provided to Hamas in a case involving claims for damages arising out of the August 9, 2001 suicide bombing of a Sbarro in downtown Jerusalem, Israel).

### b)   Aiding and Abetting

The above facts also support holding defendants Iran and MOIS liable under an aiding and abetting theory of vicarious liability. Under New Jersey law, in order to hold a defendant liable "as an aider or abettor," a plaintiff must prove the following three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." <u>Tarr v. Ciasulli</u>, 853 A.2d 921, 929 (N.J. 2004); <u>see also</u> <u>New Jersey Dept. of Treasury ex rel. McCormac v. Quest Comm. Int'l. Inc.</u>, 904 A.2d 775, 784 (N.J. Super. Ct.

App. Div. 2006) (concluding that an action against a defendant for the tort of aiding and abetting is cognizable under New Jersey Law).

In this case, Hamas's September 19, 2002 terrorist attack in Tel Aviv is just one example of the ongoing terrorist attacks against civilians in Israel that constitute a wrongful act that has caused and continues to cause injury.  It also has been established that Iran and MOIS were and are aware of the role their material support and resources play in Hamas's illegal and tortious terrorist activities.  Finally, Iran and MOIS knowingly and substantially provided their material support and resources to Hamas in furtherance of Hamas's terrorist activities, such as the September 19, 2002 Tel Aviv bus bombing.  "Iran and MOIS have aided and abetted HAMAS's goal of Islamic jihad through perpetration of terrorist attacks in the West Bank, Gaza, and within Israel, and HAMAS has been encouraged by Iran to continue and increase such attacks, often acting in return for direct financial compensation from Iran for specific terrorist acts."  Ex. 20 at ¶ 24 (Clawson Aff.).  Thus, the Court finds that Iran and MOIS aided and abetted Hamas in carrying out the September 19, 2002 Tel Aviv bus bombing.

The Court, therefore, finds that Avraham Sisso may recover against Iran and MOIS for intentional infliction of emotional distress and now proceeds to consider damages.

## III.   Plaintiff's Damages

### A.     Iran and MOIS

To recover damages against a non-immune foreign state under the FSIA, a plaintiff "must prove that the consequences of the foreign state's conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American Rule on damages." Salazar, 370 F. Supp. 2d at 115-16 (quoting Hill v. Republic of Iraq, 328 F.3d 680, 681 (D.C. Cir. 2003)).  The evidence before this Court establishes that plaintiff's emotional

distress was a reasonably certain result of the wrongful conduct of Iran and MOIS.  Iran and MOIS have intentionally engaged in a campaign of terror through the provision of training and funding to Hamas and the exhortation of Hamas to engage in terrorist activities against soldiers and civilians alike in Israel.

When determining the amount of compensatory damages to award for intentional infliction of emotional distress, courts have considered a number of factors:[8]

> (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e. closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death.

Dammarell I, 281 F. Supp. 2d at 197-98 (quoting Stethem, 201 F. Supp. 2d 89-90).

In this case, all of these factors weigh in favor of a sizable damages award.  First, the death of Rozana Sisso was unquestionably sudden and unexpected.  Just three months after she was vacationing with Mr. Sisso and his family in the United States and Canada, Rozana Sisso was killed, without any warning, in a terrorist bus bombing.

Second, Rozana Sisso's death is attributable to malice.  The terrorist attack that killed Mrs. Sisso was an organized and intentional act by Hamas, with the support of Iran and MOIS.  The attack was fully consistent with the stated goal of the defendants to "carry out violent terrorist attacks aimed at the Israeli civilian population, with the intent to impede any

---

[8] "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress." Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006); see also Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 196 n.19 (D.D.C. 2003) (hereinafter Dammarell I) ("Courts have found in [] state sponsored terrorism cases that, for damages purposes, "in an intentional homicide case such as a terrorist killing, solatium appears . . . to be indistinguishable from . . . intentional infliction of emotional distress.'").  Thus, it is appropriate to rely on cases involving solatium claims to assess damages for a claim of intentional infliction of emotional distress.

political resolution of the Israeli-Palestinian conflict by peaceful means," Ex. 20 at ¶ 24 (Clawson Aff.); Ex. 21 at ¶ 26 (Hamilton Aff.).

Third, Avraham Sisso testified that he has not sought therapy or counseling since his mother's death because he is "afraid to do it." Tr. 60.  Mr. Sisso testified that "[i]t hurts so much without" focusing on it that he does not know what would happen if he tried to think about it, as he would have to do if he sought medical attention.  This fear only underscores the severe distress felt by the plaintiff as a result of his mother's death.  Id.

Fourth, Avraham Sisso had a close relationship with his mother.  Tr. 45.  In his testimony, Avraham Sisso described their relationship as special because his mother would often seek his advice as an equal, where she was generally protective of his other siblings.  Id.  Despite the fact that Mr. Sisso moved to the United States, he and his mother maintained their close relationship through frequent, long phone calls and annual visits.  Tr. 47.  Mr. Sisso also testified that his mother was "considering moving to the United States" and that his parents had obtained U.S. Permanent Resident Cards ("green cards").  Id.  The fact that his family waited for Mr. Sisso to arrive in Israel for his mother's funeral, despite the strong urgings of rabbis that she be buried immediately, is illustrative of the strong bond between Mr. Sisso and his mother.

Finally, the duration of Avraham Sisso's mental anguish has exceeded by many years that which he would likely have experienced if his mother had died a natural death.  Dr. Pastor testified that "PTSD that persists for more than three months beyond the onset of systems (per DSM-IV) is known as chronic PTSD."  Ex. 22 at ¶ 13.  More than four years after his mother was killed in the terrorist attack, Mr. Sisso is still experiencing post-traumatic stress reactions to his mother's murder.  Mr. Sisso tries to deal with his emotional suffering by "working all the time" so that he will not think about his mother's murder.  He still suffers from

survivor's guilt and feels a sense of numbness which has lasted since he was first informed of his mother's death.  Tr. 55-60.  Thus, each of these factors weighs in favor of a sizeable damages award for Mr. Sisso.

Although it is difficult to quantify mental anguish, courts have typically awarded the surviving children of someone who was killed in a terrorist attack $5 million in compensatory damages for the emotional distress and suffering associated with the death of the parent.  See, e.g., Dammarell IV, 404 F. Supp. 2d at 324 (awarding $5 million to each surviving child of an immediate family member who was killed in the 1983 Beirut Embassy bombing); Salazar, 370 F. Supp. 2d 105 at 116 (same); Dammarell I, 281 F. Supp. 2d 105 at 197 (noting that "[a]wards to children of the victims of terrorism have generally ranged from $1.5 million to $12 million" and collecting cases); see also Stern, 271 F. Supp. 2d at  301  (concluding that $3 million was appropriate compensation for solatium for each surviving child of the victim of a 1997 terrorist bombing committed by Hamas in Jerusalem).  Taking all of the relevant factors into account, this Court finds that Avraham Sisso is entitled to a damages award of $5 million against Iran and MOIS for intentional infliction of emotional distress.

B.      Hamas

The Antiterrorism Act permits U.S. nationals who have been injured as a result of an act of international terrorism to sue to recover treble damages, as well as costs and attorneys fees.  18 U.S.C. § 2333(a).  The Court therefore trebles the compensatory damages awarded against Iran and MOIS to calculate the appropriate damages for Hamas.  Cf. Rubin v. Hamas, No. 02-975 (RMU), 2004 WL 2216489, at *3 & n.2 (D.D.C. Sept. 27, 2004) (trebling the compensatory damages awarded against Iran and MOIS in the companion case, Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003), to determine the appropriate award against Hamas in a case arising out of a 1997 suicide bombing in downtown Jerusalem).

Accordingly, this Court awards Avraham Sisso $15 million against Hamas for his emotional suffering.

**IV.     Attorneys' Fees**

        In the event that the Court finds Hamas liable to plaintiff for damages under the Antiterrorism Act, plaintiff will also be entitled to attorneys fees and costs.  See 18 U.S.C. § 2333(a) (authorizing plaintiffs to recover "the cost of the suit, including attorney's fees"). Plaintiff's attorneys will, therefore, submit an Affidavit of Attorneys Fees and Costs, pursuant to 18 U.S.C. § 2333(a), and request that the Court award attorneys fees and costs in an amount to be determined.  See, e.g. Morris v. Khadr, 415 F. Supp. 2d 1323, 1339 (D. Utah 2006) (noting that plaintiffs are entitled to attorney's fees under the ATA and ordering plaintiffs' attorneys to "submit an affidavit of fees to the court within twenty days of the date of [the Court's default judgment]" against defendants).

## CONCLUSION

        Because plaintiff has established severe emotional distress as a direct and proximate result of defendants' extreme and outrageous conduct, and because the evidence in the record amply supports the allegations of the Amended Complaint, a judgment consistent with these findings will be entered for plaintiff against defendants Iran and MOIS in the amount of $5 million, and against Hamas in the amount of $15 million.