**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AVRAHAM SISSO, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.  05-0394 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | |
| **Defendants.** | |

**MEMORANDUM OPINION**
**(Findings of Fact and Conclusions of Law)**

This civil action against defendants Islamic Republic of Iran, Iranian Ministry of

Information and Security ("MOIS"), and Harakat al-Muqawama al-Islamiyya, the jihadist

Palestinian militia more commonly known as Hamas (hereinafter "Hamas"), arises out of a suicide

bombing that destroyed a public bus in Tel Aviv, Israel, on September 19, 2002.  Rozana Sisso,

the mother of plaintiff Avraham Sisso, was killed in the explosion.  Plaintiff now seeks damages

for the emotional injuries he suffered as a result of his mother's death; he brings claims against

Iran and MOIS under New Jersey tort law, and against Hamas under the Antiterrorism Act of

1991 ("ATA"), 18 U.S.C. § 2333(a) (2000).  Plaintiff further contends that Iran and MOIS, both

considered a foreign state for purposes of the Foreign Sovereign Immunities Act of 1976

("FSIA"), 28 U.S.C. §§ 1601-1611 (2000), have waived their sovereign immunity pursuant to the

statutory exception for claims based on acts of state-sponsored terrorism.  See § 1605(a)(7).

To date, defendants have not entered an appearance in this action.  On August 23, 2006,

this Court granted in part and denied in part plaintiffs' motion for entry of default,[1] and the Clerk

of the Court entered default against all three defendants.  Before this Court can enter a default

judgment against either Iran or MOIS, plaintiff is required by the FSIA to establish his claims "by

evidence satisfactory to the court."  § 1608(e).  Accordingly, the Court held an evidentiary hearing

on December 7, 2006, and now issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff, in his proposed findings of fact and conclusions of law submitted to the Court,

observes that in a typical default action, as opposed to a default action under the FSIA, the fact of

default concedes the truth of the allegations in the complaint.  See, e.g., Adkins v. Teseo, 180 F.

Supp. 2d 15, 17 (D.D.C. 2001) ("A defaulting defendant is deemed to admit every well-pleaded

allegation in the complaint.").  He also notes that because Hamas is not a sovereign entity, he is

not required to prove the truth of his allegations with respect Hamas.  Although plaintiff's claim

against Hamas is not independently subject to the heightened evidentiary showing required by the

FSIA's default-judgment provision, his claims against Iran and MOIS (both of which are subject

to the FSIA, see Sisso, 448 F. Supp. 2d at 81 n.6) depend upon the Court finding the sovereign

defendants vicariously liable for actions taken by Hamas.  Under these circumstances, the Court

will make factual findings with respect to the allegations against all three defendants.

---

[1]In addition to the state-law and ATA claims considered in this memorandum opinion, the initial complaint in this action stated claims under the Israeli Civil Wrongs Ordinance ("ICWO") on behalf of Avraham Sisso as well as Charles Sisso, Tobi Barda, Galit Sider, and Moshe Siso -- Rozana Sisso's husband and other children.  Upon consideration of plaintiffs' motion for entry of default, this Court dismissed the ICWO claims for failure to state a claim upon which relief can be granted.  See Sisso v. Islamic Republic of Iran, 448 F. Supp. 2d 76, 92 (D.D.C. 2006). Additionally, on August 2, 2006, Avraham Sisso voluntarily dismissed a claim brought under Israeli law in his capacity as legal representative of the estate of Rozana Sisso.

**I.      Background and Events of September 19, 2002**

Plaintiff Avraham Sisso was born in Beer Sheva, Israel on September 23, 1963.  Tr. 34:6-

10; Ex. 11.  After growing up in Israel with his parents, his older brother Moshe, and his younger

sisters Tobi and Galit, plaintiff moved to the United States in 1989.  Tr. 15:11-22, 35:25-36:2,

34:11-12.  He became a naturalized American citizen on April 11, 1996.  Tr. 34:17-35:15; Ex. 11.

At the time of the terrorist attack in September 2002, Mr. Sisso was living in New Jersey, Tr.

50:5-7; he now resides in Michigan with his wife Cindy and his two daughters, aged ten and

thirteen, Tr. 33:25-34:4.  Mr. Sisso's mother, Rozana Sisso, lived in Gan Yavne, Israel at the time

of her death.  Tr. 16:21-22.  Mr. Sisso's father and siblings remain in Israel.  Tr. 39:17-22.

Mr. Sisso testified that his relationship with his mother was special and different from the

relationships she had with her other children.  Tr. 45:7-18.  He explained that while Rozana Sisso

was protective of his siblings, she treated him as more of an equal and often asked for his advice.

Id.  Mr. Sisso also spoke of his mother as playing a central role in his decision to move to the

United States; she later considered moving to the United States herself, going so far as to obtain a

green card.  Tr. 45:19-47:4.  Even after Avraham Sisso moved to the United States, he maintained

a close relationship with his mother.  They had long phone conversations every other week and

visited each other in person about every other year.  Tr. 47:5-14.  The last such visit occurred

approximately three months before Rozana Sisso's death, when she traveled with Avraham Sisso

and his family to Portland, Maine and Montreal, Quebec.  Tr. 47:15-49:25, Ex. 14.

At the time of her death, Rozana Sisso worked in Tel Aviv, where she owned and operated

a women's clothing store at 101 Allenby Street.  Tr. 16:23-17:7.  The shop, called Rozana's Shop,

was located across the street from the Great Synagogue, which is the biggest synagogue in Tel

Aviv.  Tr. 20:21-21:3, Exs. 1, 2.  Plaintiff's brother, Moshe Siso, owns a jewelry store that was

also located at 101 Allenby Street, adjacent to Rozana's Shop.  Tr. 13:4-14:6, Ex. 1.  Both stores

were situated near a bus stop for the number 4 bus, Tr. 21:7-22, Exs. 1, 2, and the entire area was

heavily trafficked by pedestrians, particularly tourists visiting the Great Synagogue, Tr. 15:1-6.

On September 19, 2002, shortly before 12:55 p.m., Iyad Radad boarded a number 4 bus

near 94 Allenby Street in Tel Aviv.  Ex. 18 at 3, 15.  Just as the bus began to move, Radad

activated an explosive device that he was wearing.  Id.  The resulting explosion killed six people,

including Rozana Sisso.  Id.  The attack also injured eighty-four other people and caused

extensive damage to the bus and nearby shops and cars.  Id.  Moshe Siso witnessed the terrorist

attack on September 19, 2002.  He described the horrific details of the bombing and its aftermath

in his testimony at the evidentiary hearing held by this Court.  See Tr. 23-29.

Avraham Sisso was in Massachusetts at a business meeting on Thursday, September 19,

2002, and was notified of his mother's death by a phone call from his wife.  Tr. 50:8-24.  He felt

"shock and disbelief" upon hearing the news and immediately arranged to fly to Israel to attend

her funeral.  Tr. 51:1-52:5.  Even though Jewish tradition requires that funerals take place as soon

as possible, the family waited several days -- until after Mr. Sisso had arrived -- before holding the

ceremony out of the belief that Rozana would have wanted him to be there.  Tr. 51:19-52:17.  Mr.

Sisso stayed in Israel for the traditional week-long period of mourning and remained there for

several additional weeks.  Tr. 52:21-53:3.

Plaintiff was profoundly affected by the death of his mother.  He testified that he has been

"in shock ever since" hearing the news, Tr. 51:4-6, and that he is "not the same person [he] was

before," Tr. 55:10.  He explained that he used to think of himself as a fun person who spent time

with his children and enjoyed life.  Tr. 55:11-16.  Since his mother's death, however, Mr. Sisso

has felt "sad almost all the time" and thinks about her death whenever he has free moments.  Tr.

55:17-25.  As a result, Mr. Sisso is "dealing with [her death by] working all the time."  Tr. 56:2-3.

He no longer coaches his daughters in soccer and he abandoned plans to obtain the MBA that he

was studying for at the time of Rozana Sisso's death.  Tr. 55:10-16, 56:20-24.  Mr. Sisso also

described experiencing feelings of guilt when he does enjoy himself, and he also wonders whether

he should have done more to bring his mother permanently to the United States.  Tr. 56:7-17.  He

does not sleep as well as he used to because he is less physically active, and he remarked that he

often feels tired but does not know why.  Tr. 57:1-4.

Plaintiff submitted affidavit testimony from Dr. Larry Howard Pastor, a psychiatrist whom

this Court finds to be qualified as an expert in Post-Traumatic Stress Disorder, including

psychiatric responses to traumatic events such as terrorism.  See Ex. 22 ¶¶ 1-11.  Dr. Pastor

explained that when the death of a loved one is caused by a sudden, violent traumatic event, "post-

traumatic stress reactions interfere with the understanding, acceptance, and internalization of the

representation of the lost loved one that is the essence of the bereavement and grief process."  Ex.

22 ¶ 17.  Thus, the survivors "tend to focus on the experience of the traumatic event" in a way that

"intefere[s] with the ability to retain comforting memories that would allow the bereaved survivor

to accept the reality of the loss and move forward with life."  Id.  "Furthermore, sudden or

unexpected death leaves little or no time for anticipation, or for psychological 'letting go' of the

lost loved one."  Id. ¶ 18.

Dr. Pastor's testimony confirms that plaintiff has experienced many of the psychological

consequences commonly felt by the surviving family members of terrorist attack victims.  For

example, traumatic stress and grief may lead to reactions that include anxiety, intense sadness,

intrusive thoughts or imagery, shame or self-blame, fatigue, emotional and social withdrawal, and

"an unwillingness or inability of the surviving person to take enjoyment in life, or to participate in

certain activities that were part of that person's life prior to the traumatic loss." Id. ¶ 20.  Dr.

Pastor also explained that "survivor's guilt" -- which takes the form of feeling a "sense of

responsibility and a belief, however unrealistic, that [the survivor] could have somehow prevented

[the] loved one's death" -- can limit the ability of a surviving family member to move beyond the

loss and impede his or her enjoyment of ordinarily pleasurable experiences.  Id. ¶ 21.

## II.     Hamas's Responsibility for the September 19 Attack

According to the 2002 Patterns of Global Terrorism report, published by the U.S.

Department of State, Hamas has claimed responsibility for the explosion in Tel Aviv on

September 19, 2002.  Ex. 19 at 92.  Hamas was founded in 1987 "as an outgrowth of the

Palestinian branch of the Muslim brotherhood," and has been deemed a Foreign Terrorist

Organization by the Secretary of State pursuant to 8 U.S.C. § 1189.  Id. at 101, 107; see also Ex.

21 ¶ 9.  It uses violent means to achieve its goal of establishing an Islamic Palestinian state in

place of the State of Israel.  Ex. 19 at 107; see also Ex. 21 ¶ 9.  As explained by Christopher D.

Hamilton, an expert on Hamas and Middle East terrorism and counterterrorism,[2] Hamas's attacks

are indiscriminate in nature and are intended to terrorize the general Israeli population, including

---

[2]Mr. Hamilton is a Senior Fellow in Terrorism Studies at the Washington Institute for Near East Policy and a former FBI counter-intelligence expert.  See Ex. 21 (Aff. of Christopher D. Hamilton) ¶¶ 1-5.  The Court received testimony from Mr. Hamilton in affidavit form.  See Ex. 21.  The Court also accepted affidavit testimony from Dr. Patrick L. Clawson, who is the Deputy Director for Research at the Washington Institute for Near East Policy and an expert in Iranian politics, the Iranian economy, and Iranian sponsorship of terrorism.  See Ex. 20.  The Court finds that both Mr. Hamilton and Dr. Clawson qualify as experts in their respective fields of study.

the surviving relatives and friends of the direct victims of attacks.  Ex. 21 ¶ 15.  In planning these

attacks, Hamas purposefully targets heavily populated places such as buses, bus stops, restaurants,

markets, discotheques, and universities.  Id.  Between September 2000 and March 2004, Hamas

was responsible for 425 terrorist attacks that killed 377 people and wounded 2076 others; fifty-

two of those terrorist events were suicide attacks that took place in Israel and killed 288 people

and wounded 1646.  Id. ¶ 13 (citing Matthew Levitt, HAMAS: Politics, Charity, and Terrorism in

the Service of Jihad 12 (2006)).

Additional, direct evidence links Hamas to the September 19, 2002, bombing on Allenby

Street.  On April 13, 2003, Ashraf Zayar pleaded guilty in Jerusalem district court to crimes he

committed in connection with his participation in the September 19 attack.  Ex. 18 at 15-16.

Those crimes included membership in a terrorist organization, i.e., Hamas, as well as the murder

and attempted murder of the bombing victims.  Id.  As part of his guilty plea, Zayar admitted that

he chose the bus stop on Allenby Street as the location for a terrorist act because it was a crowded

area that would provide for many victims.  Id. at 2, 15.  Zayar also admitted that he videotaped

Iyad Radad, the suicide bomber, in a Hamas-financed apartment prior to the attack and then

transported Radad to Allenby Street with the direction to blow himself up.  Id. at 2-3, 15.

Furthermore, Hamas leader Sheikh Mohammad Siyam was videotaped giving a speech at a

"group wedding ceremony" that took place in Yemen on September 19, 2002, the same day as the

Tel Aviv bombing.  See Exs. 21 ¶ 30 (identifying Shiekh Siyam as Hamas leader); 24A, 24B

(Wedding Video & Translation).  Mr. Hamilton testified that Hamas uses the term "wedding" to

refer to a terrorist operation or to a suicide bomber because it is symbolic of the suicide bomber

being wed to the Hamas cause or to God.  Id. ¶ 29.  In the wedding video submitted into evidence

by plaintiff, Sheikh Siyam states that "those who organized this celebration [in Yemen] knew

about the timing of Hamas's operation in Tel Aviv, that it will occur today, and that would be

leaking the news, so they held the wedding here to coincide with the wedding over there."  Ex.

24B at 4.  Sheikh Siyam also refers to the Tel Aviv terrorist attack as "an organized operation that,

God willing, you will read about in the newspapers tomorrow and hear about it in the media" --

one that "brought down a large number of the invaders and occupiers, thanks be to God."  Id.

These statements demonstrate that the leaders of Hamas had knowledge of the September 19,

2002, bombing before it occurred.  See Ex. 21 ¶ 30.

III.    The Support of Iran and MOIS for the September 19 Attack

        Iran was designated a state sponsor of terrorism in 1984 and has been on the State

Department's list of state sponsors of terrorism ever since.  See Dammarell v. Islamic Republic of

Iran, 404 F. Supp. 2d 261, 273-74 (D.D.C. 2005) ("Dammarell IV"); see also 22 C.F.R. § 126.1(d)

(2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the Export

Administration Act of 1979--Iran, 49 Fed. Reg. 2836, 2836 (Jan. 23, 1984).  MOIS is Iran's

intelligence service.  Ex. 20 ¶ 29.  The State Department has concluded that Iran "has used its

intelligence services extensively to facilitate and conduct terrorist attacks."  Ex. 19 at 29; see also

Ex. 20 ¶ 30.  According to Dr. Clawson, Iran and Hamas share a common goal of carrying out

violent terrorist attacks aimed at the Israeli civilian population in order to impede the peaceful

resolution of the Israeli-Palestinian conflict.  Ex. 20 ¶¶ 24, 37-38.  Iran has sought a close

relationship with Hamas as a means of achieving direct involvement in that regional conflict.

Id. ¶ 17.  Indeed, Dr. Clawson testified (based on briefings he received from high-level Israeli and

American officials) that former Palestinian Authority Chairman Yasser Arafat once stated that

Iran had "ordered" Hamas to carry out suicide bombings.  Id. ¶ 36.

In order to achieve these shared goals, Iran has financed and run camps that provide

military and other training to Hamas operatives.  Id. ¶¶ 15-21.  Beginning in 1993, Iran has funded

training camps operated in Lebanon by Hizbollah, a terrorist organization controlled and funded

by Iran.  Id. ¶¶ 15, 21.  Iran has also operated (through MOIS and other government entities)

terrorist camps of its own in Lebanon and Iran.  Id.  Additionally, Iran has supplied Hamas with

weapons, including explosives, automatic weapons, ammunition, hand grenades, shoulder-fired

missiles, rockets and launchers, and provided Hamas with training to use those weapons.  Id. ¶ 22.

In Dr. Clawson's opinion, the training and weapons provided by Iran and MOIS "allowed [Hamas]

to rapidly evolve into a dangerous and effective terrorist organization," id. ¶ 19, and the

"operational and technical capabilities" utilized by Hamas in its bombing attacks against Israeli

civilians "are a direct product of Iranian-supplied training," id. ¶ 23.

Iran further supports Hamas's terrorist activities with direct funding that is at least partially

channeled through MOIS.  Id. ¶ 26.  Dr. Clawson believes that Iran's direct financial support for

Hamas from 2000 to 2002 was in the amount of at least several million dollars per year, and other

credible sources suggest that much larger monetary amounts were provided in preceding years.

Id. ¶ 39; see also, e.g., Levitt, supra, at 172 ("According to the Canadian Secret Intelligence

Service, 'in February 1999, it was reported that Palestinian police discovered documents that attest

to the transfer of $35 million to Hamas from the Iranian Intelligence Service (MOIS), money

reportedly meant to finance terrorist activities against Israeli targets.'").  Dr. Clawson also testified

that there are credible reports that Iran provides special monetary rewards to Hamas after terrorist

attacks, especially those resulting in many casualties, as a means of encouraging deadly attacks in

Israel's population centers.  Id. ¶ 35.

Iran and MOIS exhibited this pattern of support for Hamas in 2002, the year of Rozana

Sisso's death.  As described in the Patterns of Global Terrorism report for that year, "Iran

remained the most active state sponsor of terrorism in 2002."  Ex. 19 at 77.  Specifically:

> During 2002, Iran maintained a high-profile role in encouraging anti-Israeli activity, both rhetorically and operationally.  Supreme Leader Khamenei referred to Israel as a "cancerous tumor" . . . . Matching this rhetoric with action, Iran provided Lebanese Hizballah and Palestinian rejectionist groups -- notably HAMAS . . . -- with funding, safehaven, training, and weapons.  Tehran also encouraged Hizballah and the Palestinian rejectionist groups to coordinate their planning and to escalate their terrorist activities against Israel.

Ex. 19 at 77.  Furthermore, in Dr. Clawson's opinion, the September 19, 2002 bombing in Tel

Aviv exhibited a "level of sophistication in bomb making, in planning, and in execution . . .

consistent with the sort of advanced training that Iran has supplied to HAMAS over the years

leading up to 2002."  Ex. 20 ¶ 23.

## CONCLUSIONS OF LAW

**I.      Intentional Infliction of Emotional Distress Claims against Iran and MOIS**

**A.      Jurisdiction under the FSIA**

This Court, in its August 23, 2006, memorandum opinion, tentatively concluded that

plaintiff had established subject-matter jurisdiction over Iran and MOIS pursuant to the FSIA.

See Sisso, 448 F. Supp. 2d at 82 & n.9.  Personal jurisdiction was satisfied when plaintiffs

properly effectuated service on Iran and MOIS.  See id. at 83.  As explained more fully there, see

id. at 81-82, the FSIA provides the exclusive basis for subject-matter jurisdiction over plaintiff's

claims against Iran and MOIS, so long as one of the FSIA's statutory exceptions to sovereign

immunity applies.  See 28 U.S.C. § 1330 (2000); Argentine Republic v. Amerada Hess Shipping

Corp., 488 U.S. 428, 434 (1989); Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82,

89 (D.C. Cir. 2002).  The Court now concludes that Iran and MOIS's actions bring them within

the so-called terrorism exception to sovereign immunity found in § 1605(a)(7).

> The terrorism exception removes sovereign immunity in any civil action
>
> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

Id.  This exception applies only if the foreign state was designated as a state sponsor of terrorism

at the time of the act or as a result of the act, the foreign state was afforded a reasonable

opportunity to arbitrate the claim if the act occurred in the foreign state, and the claimant or the

victim was a national of the United States when the act occurred.  Id.  All of these requirements

have been met in this case.  See Sisso, 448 F. Supp. 2d at 85.

Furthermore, the facts demonstrate that plaintiff's injury was caused by the provision by

Iran and MOIS of material support or resources for an act of extrajudicial killing.  The September

19 bombing qualifies as an act of extrajudicial killing.  The killing of Rozana Sisso, as well as the

death of the other victims of the suicide attack, was both deliberate and "not authorized by a

previous judgment pronounced by a regularly constituted court affording all the judicial

guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C. § 1350 note;

see § 1605(e) (defining "extrajudicial killing" by reference to Torture Victim Protections Act of

1991).

Iran and MOIS provided material support or resources for that act of extrajudicial killing.

The FSIA defines "material support or resources" as

any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b); see § 1605(a)(7) (referring to definition in 18 U.S.C. § 2339A). As noted, Iran and MOIS provided money, training, explosives and weapons to Hamas operatives during and before 2002 in order to further Hamas's goal of committing terrorist attacks against the Israeli civilian population -- attacks like the bus bombing that occurred on September 19, 2002.

Finally, plaintiff has sufficiently demonstrated that the material support and resources provided by Iran and MOIS to Hamas caused plaintiff's injury. The FSIA's causation requirement is satisfied by a showing of proximate cause. See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004). Proximate cause exists so long as there is "'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" Id. at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). "This classic tort notion normally eliminates the bizarre, and its use should obviate not only the complication but even the need for further temporal or spatial limitations."[3] Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 536 (1995) (citation omitted). The evidence demonstrates that the funding and training Iran and MOIS provided to Hamas was crucial to Hamas's ability to carry out its coordinated bombing attacks in Israel, including the

---

[3]As the D.C. Circuit has explained, the FSIA requires a showing of causation for purposes of establishing subject-matter jurisdiction only; in the usual case, a plaintiff must also prove causation as one of the elements of the underlying substantive claim, and "[a]ny concerns about reaching too far to charge foreign states with the attenuated impact of their financial activities are better addressed as questions of substantive law." Kilburn, 376 F.3d at 1129. As explained infra, plaintiff has demonstrated that Iran and MOIS are vicariously liable for Hamas's actions in the September 19 bombing pursuant to the civil-conspiracy law of New Jersey.

bombing that killed Rozana Sisso.  Furthermore, Iran and MOIS could reasonably foresee that the material support being furnished to Hamas would facilitate such attacks.  Hence, defendants are not entitled to sovereign immunity, and this Court has subject-matter jurisdiction over the claims against them.

### B.    Substantive Liability

It is now well-established that the terrorism exception of § 1605(a)(7) "merely waives the immunity of a foreign state without creating a cause of action against it."  Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  "Rather, . . . a plaintiff proceeding under the FSIA must identify a particular cause of action arising out of a specific source of law."  Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004); see also Dammarell v. Islamic Republic of Iran, No. 01-cv-2224, 2005 WL 756090, at *17 (D.D.C. Mar. 29, 2005) ("Dammarell II") ("As a general rule, state law should provide a cause of action against a foreign nation in a section 1605(a)(7) claim.").  Plaintiff has asserted a state-law claim for the intentional infliction of emotional distress ("IIED"); in particular, Mr. Sisso seeks, through the application of civil-conspiracy doctrine, to hold Iran and MOIS liable for intentional infliction of emotional distress based on actions taken by Hamas.  The Court will apply the law of New Jersey, where the plaintiff was domiciled at the time of the terrorist attack.  See Dammarell II, 2005 WL 756090, at *21 (concluding that, under District of Columbia's choice-of-law analysis, "the general rule in these claims should be the application of the law of the state of domicile of the plaintiff").

Before reaching the merits of the substantive claim, then, this Court must consider whether plaintiff has proven that Iran and MOIS were part of a civil conspiracy with Hamas.  "In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to

commit an unlawful act, . . . the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'"  Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005) (quoting Morgan v. Union County Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993)).  Although the participants "must share the general conspiratorial objective," they "need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result."  Morgan, 633 A.2d at 999 (internal quotation marks omitted). Furthermore, the agreement need not be explicit.  Banco Popular N. Am., 876 A.2d at 263. "Where there is no direct evidence of an agreement between the alleged co-conspirators, the factfinder 'may infer from the circumstances that [the alleged conspirators] had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives.'"  Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 102-03 (D.D.C. 2006) (alteration in original) (quoting Morgan, 633 A.2d at 998).

At least one district court has already determined that Iran and MOIS have entered into a civil conspiracy with Hamas to commit terrorist attacks in furtherance of the goals of "eradicating the Jewish state of Israel and promoting Islamic ideology."  Greenbaum, 451 F. Supp. 2d at 103 (applying New Jersey law).  The factual findings in this action, in particular those based upon Dr. Clawson's testimony and the 2002 Patterns of Global Terrorism report, support the same conclusion.  Accordingly, this Court finds that Iran and MOIS conspired with Hamas to commit terrorist attacks against Israeli civilians.  Hence, Iran and MOIS are liable for the substantive acts committed by Hamas in furtherance of the conspiracy.  See Morgan, 633 A.2d at 999.  In particular, the bombing that occurred on September 19, 2002, was "reasonably foreseeable as

[one of] the . . . natural consequences of the conspiracy." Id. Thus, if Hamas's actions support a claim for intentional infliction of emotional distress, Iran and MOIS will also be liable for IIED.

Under New Jersey law, a plaintiff seeking to establish a claim for intentional infliction of emotional distress must demonstrate that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions were the proximate cause of the plaintiff's emotional distress; and (4) the emotional distress suffered by plaintiff is so severe that no reasonable man could be expected to endure it. Buckley v. Trenton Saving Fund Soc'y, 544 A.2d 857, 863 (N.J. 1988). Taking these elements one by one, the Court concludes that plaintiff has proven his claim.

First, a defendant must intend both to do the underlying act and to produce emotional distress in the plaintiff. Id. Here, it is clear based on the Zayar guilty plea, the group wedding video, and Mr. Hamilton's testimony that Hamas intended both to cause the terrorist explosion and to create emotional distress among the relatives of its victims. Moreover, "[c]ourts have uniformly held that a terrorist attack -- by its nature -- is directed not only at the victims but also at the victims' families." Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005). Second, the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The terrorist attack that killed Rozana Sisso and five others, injured scores more, and resulted in massive chaos, fear, and the destruction of property, clearly qualifies as extreme and outrageous. Third, plaintiff must demonstrate proximate cause. That standard is also plainly satisfied -- the emotional injuries Mr. Sisso sustained are the direct and foreseeable (indeed,

intentional) result of the terrorist attack.  Finally, the emotional distress must be severe.  "'Severe

emotional distress means any type of severe and disabling emotional or mental condition which

may be generally recognized and diagnosed by professionals trained to do so, including . . .

posttraumatic stress disorder.'"  Taylor v. Metzger, 706 A.2d 685, 697 (N.J. 1998) (alteration in

original).  When the intentional conduct is directed at the plaintiff, as is the case here, he is not

required to prove any accompanying physical injury.  See Buckley, 544 A.2d at 864.  Although

plaintiff has not officially been diagnosed with post-traumatic stress disorder, Mr. Sisso testified

to continuously experiencing severe emotional problems including sadness, guilt, social

withdrawal, and an inability to move beyond his mother's death -- symptoms that expert

psychiatrist Dr. Larry Pastor identified as consistent with post-traumatic stress reactions.

In sum, the Court concludes that Hamas's actions and plaintiff's resulting injury satisfy the

requirements of an IIED claim under New Jersey law, and therefore -- applying the doctrine of

civil conspiracy -- Iran and MOIS are liable for intentional infliction of emotional distress.

## C.      Damages

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must

prove that the consequences of the foreign state's conduct were 'reasonably certain (i.e., more

likely than not) to occur, and must prove the amount of damages by a reasonable estimate

consistent with this [Circuit]'s application of the American rule on damages.'"  Salazar, 370 F.

Supp. 2d at 115-16 (alteration in original) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 681

(D.C. Cir. 2003)).  Plaintiff has demonstrated that his emotional distress was a reasonably certain

outcome of the material support that Iran and MOIS furnished to Hamas -- support intended to

further Hamas's ability to carry out terror attacks targeting Israeli civilians.  Furthermore,

plaintiff's request for $5 million in compensatory damages for his emotional suffering, see Pl.'s

Proposed Findings of Fact & Conclusions of Law at 37, is a reasonable estimate of his injuries

that is consistent with awards made in similar FSIA cases.  See, e.g., Greenbaum, 451 F. Supp. 2d

at 106 (awarding $5 million to parent of victim); Dammarell IV, 404 F. Supp. 2d at 324 (child of

victim); Salazar, 370 F. Supp. 2d at 116 (spouse of victim); Dammarell v. Islamic Republic of

Iran, 281 F. Supp. 2d 105, 197 (D.D.C. 2003) (listing cases).  The Court thus finds plaintiff's

estimate to be both a reasonable and appropriate damages award for his IIED claim and will enter

judgment against Iran and MOIS in the amount of $5 million.

## II.    ATA Claim against Hamas

Plaintiff alleges that Hamas's involvement in the September 19 bombing constitutes an act

of international terrorism giving rise to a claim under the civil-remedies provision of the ATA.[4]

Compl. ¶¶ 41-48.  The ATA provides that "[a]ny national of the United States injured in his or

her person, property, or business by reason of an act of international terrorism . . . may sue

therefor in any appropriate district court of the United States and shall recover threefold the

damages he or she sustains and the cost of the suit, including attorney's fees."  § 2333(a).  Based

on the findings of fact presented earlier in this opinion, plaintiff has asserted a successful claim

against Hamas under the ATA.

Plaintiff Avraham Sisso is a United States citizen, and was a citizen at the time of the

September 19 bombing.  Mr. Sisso was also injured in his person by the bombing.  As another

---

[4]The Court reaffirms its earlier conclusion that subject-matter and personal jurisdiction exist for the ATA claim.  See Sisso v. Islamic Republic of Iran, 448 F. Supp. 2d 76, 86 n.14 (D.D.C. 2006) (finding subject-matter jurisdiction under 28 U.S.C. § 1331); id. at 88-90 (finding personal jurisdiction over Hamas pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure).

judge of this Court has explained, the ATA "does not specifically require that a plaintiff suffer

physical harm prior to filing suit."  Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d

172, 182 (D.D.C. 2004).  "Moreover, the term 'personal injury' means '[a]ny invasion of a

personal right, including mental suffering . . .'"  Id. at 182 (citing Black's Law Dictionary (7th ed.

1999).  Thus, injuries consisting of mental anguish and emotional pain and suffering -- the

injuries felt by plaintiff in this case -- are cognizable under the ATA.  Id.; see also Hurst v.

Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 30 (D.D.C. 2007) (holding that

siblings and parents of individuals killed in terrorist attack could bring ATA claims for emotional

distress); Morris v. Khadr, 415 F. Supp. 2d 1323, 1338 (D. Utah 2006) (recognizing claims for

emotional injuries brought by relatives of terrorist victims); Linde v. Arab Bank, PLC, 384 F.

Supp. 2d 571, 589 (E.D.N.Y. 2005) (same).

Furthermore, plaintiff experienced his emotional injuries by reason of an act of

international terrorism.  The ATA defines "international terrorism" to mean activities that

> (A) involve violent acts or acts dangerous to human life that are a violation
> of the criminal laws of the United States or of any State, or that would be a
> criminal violation if committed within the jurisdiction of the United States or of
> any State;
> (B) appear to be intended --
> > (i) to intimidate or coerce a civilian population;
> > (ii) to influence the policy of a government by intimidation or
> coercion . . .; and
> (C) occur primarily outside the territorial jurisdiction of the United States.

§ 2331(1).  The September 19 bombing was a violent act that would be a criminal violation if

committed within the United States; it was intended to intimidate the civilian population of Israel

and thereby to influence Israeli governmental policy; and it occurred outside the territorial

jurisdiction of the United States.  The bombing was also the proximate cause of plaintiff's

emotional injuries.  See Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.,

291 F.3d 1000, 1011-12 (7th Cir. 2002) (holding that ATA's "by reason of" requirement embodies

proximate-cause standard); Biton, 310 F. Supp. 2d at 182 (same).  Mr. Sisso's injuries were

proximately caused by the terrorist attack that killed his mother because they were a foreseeable

result of that event.

The Court accordingly finds that plaintiff is entitled to treble damages under the ATA.

Based on his compensatory damages of $5 million, treble damages will be awarded in the amount

of $15 million.  Plaintiff is also entitled by statute to recover the cost of this suit, including

attorney's fees; the Court will require plaintiff's counsel to submit an application for fees and

costs by a date specified in the order accompanying this memorandum opinion.

## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record herein, this Court

finds that plaintiff is entitled to a default judgment against Iran and MOIS for intentional

infliction of emotional distress in the amount of $5 million.  The Court further concludes that,

pursuant to the ATA, plaintiff is entitled to a $15 million default judgment against Hamas for an

act of international terrorism.  Attorney's fees and costs will be awarded in an amount to be

determined.  A separate default judgment and order is issued herewith.


                                           /s/ John D. Bates
                                         JOHN D. BATES
                                    United States District Judge


Dated:    July 5, 2007